SIMPSON (TALBOT v.). See Case No. 13,-730.

SIMPSON (WHEELER v.). See Case No. 17,500.

## Case No. 12,887.

### SIMPSON v. WIGGIN et al.

[3 Woodb. & M. 413.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1847.

USURY—WHO MAY TAKE ADVANTAGE OF — SALE— MISREPRESENTATION—CAVEAT EMPTOR —EQUITABLE RELIEF.

1. Where usury is averred to have taken place between A & Co. and B in a loan of money and sale of goods, if B afterwards sell the same goods to C, the latter cannot take advantage of such usury.

2. So if fraud or misrepresentation existed as to the goods in the sale between A & Co. and B, no recovery can be had by C for it, against A & Co., unless they were practiced on C also by A & Co., and in that last sale, if done by A alone, he must be prosecuted alone for what he did alone and wrongfully.

3. Averments by a vendor as to the price or value of an article, if exaggerated, are not so strong evidence of fraud as erroneous averments in relation to title or other material facts more exclusively within his own knowledge.

4. And if an article like tobacco in kegs is sold, and is partly opened for inspection, and more is offered to be opened, and the quality turns out to be worse than either party supposed, the vendor is not liable for fraud, nor can that sale or a subsequent sale of the article be rescinded on that ground.

5. If a vendee discovers articles so purchased to be of less value than he supposed, and wishes to rescind the contract on that account, or for fraud practiced in the sale, he should offer to return the articles, and not dispose of them at public auction, and proceed in equity for damages merely. The remedy for damages, in such a case, is full at law.

6. If B, in an exigency to obtain money, or suffer a large loss, agree to give more for an article on long credit than its market value, in order to sell it soon and raise a part of the money, the sale is not void for oppression, and probably not for usury, if nothing material was concealed, and the vendor was not the creditor of the purchaser, nor a money lender, but a dealer in goods like those sold.

This was a bill in equity upon the following allegations: One R. C. Otis, of Southport, Wisconsin, having a large amount of

1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

real estate, so situated that his title to it would be lost, and some $15,000 or $20,000 sacrificed, if he did not raise about $9,000 before the 5th of November, 1845, proceeded to Boston with a view, if possible, to borrow that amount in money. Upon his arrival there, he was unable to effect a loan, unless on such terms as seemed almost equally ruinous with the losses anticipated if he did not succeed. Afterwards he met with James S. Wiggin, one of the defendants, in October of that year, and attempted to obtain the money from him. Wiggin was unwilling to lend it on any security which Otis was able to give, but being a merchant in company with Copeland, the other defendant, agreed to sell Otis $13,009 worth of goods, as valued in the invoice, the prices to be agreed on between them, and the articles to be selected by Otis, except that a lot of tobacco, amounting to about 20,769 lbs., should constitute a part of the goods, at 25 cts. per lb., making $5,197.50. The title of the goods was to be secured to Wiggin & Co. till other satisfactory responsibility could be obtained by mortgages in Wisconsin, or by a sale of the goods. In the meantime Wiggin was to accompany Otis westward, and advance such other sum on like security as might be necessary to relieve Otis, not exceeding $9,000. The goods were packed and forwarded towards Detroit, and Wiggin and Otis started for Wisconsin. Having reached Detroit, and being unexpectedly detained there for a day about the 4th of November, Wiggin applied to Simpson, the complainant, to purchase the goods of Otis and pay or secure their value. He exhibited an invoice of them, and recommended their good quality. At length B. G. Simpson agreed to purchase them on a discount of $1,850 from the bill of sale to Otis by Wiggin & Co., but in that bill the tobacco had been invoiced, by Otis's request, at 30 cts. per lb., instead of 25, the actual price given. Simpson assigned the goods to C. Howard, as security for $6,000 which he borrowed of him and paid over to Otis, and gave his notes and draft to him for the balance, all of which were transferred to Wiggin & Co., and further security given by Otis when they reached Wisconsin, for the residue of the amount to be paid Wiggin for the goods, and the $9,000 advanced by him in money. Things remained in this situation till the goods failed to reach Buffalo so early as was expected, and a portion of them were found to be much injured by accidents on their way thither. Other portions, including the tobacco, were found not to be in a merchantable condition and were stopped at Buffalo by the agents of the complainant. The tobacco was sent to New York City for sale, and the articles damaged on the canal were sold at public auction at Buffalo. The rest were forwarded by sailing vessels to Detroit, and injured by the long passage and accidents before arriving there. The whole realized, after being sold by Simpson's agents, but little more than

the $6,000 advanced by Howard. The tobacco was afterwards sold back to Wiggin & Co. at the rate of ten cents per lb., after an angry negotiation. The present bill was instituted, averring fraud and usury in Wiggin & Co. in the sale of the goods to Simpson, as well as to Otis, and asking that it be rescinded, and the notes of Simpson, which had been transferred by Otis to Wiggin & Co., be pronounced null and surrendered.

The answer of the respondents denied all usury and fraud, or misrepresentations at Boston or Detroit. It further denied any loan to be effected by the sale of the goods to Otis, and alleged that the goods were worth the price asked for them, considering the length of credit, risk of the security and distance. It further averred that Otis, and not Wiggin, made the bargain and sale to Simpson, and that accidents and bad management caused the losses sustained by Simpson, as without them the goods at Detroit uninjured by the voyage would have sold for more than the invoice. It also alleged that Simpson was requested to give up the bargain after Otis and Wiggin reached Wisconsin, but did not do it, though offered $200 if he would. Rec. p. 159. There was much testimony, the results of which will be given in the opinion of the court where material.

R. H. Dana, Jr., for complainant.
C. G. and F. C. Loring, for respondents.

WOODBURY, Circuit Justice. The first question to be settled in this case is, with whom the respondents made their contract and sale. And if not with the plaintiff, whether the respondents did or said anything to the plaintiff falsely and fraudulently, so as to render them liable to him in this bill.

In respect to the first question, no contradictory evidence whatever exists that the original contract at Boston was made by Wiggin & Co. with Otis. He alone wanted the money, and came to Boston and participated in the purchase. Otis there acted, also, for himself, and not for Simpson, and, indeed, had then not seen Simpson or had any connection with him whatever in respect to the matter. The original usury, then, as well as fraud, and any original misrepresentations were all made to Otis, and hence he alone can prosecute for them, or rescind the sale, or avoid any securities given to Wiggin by him on account of it. The loss by any usury was Otis's loss, and not Simpson's, and it is well settled, that if usury exist in a sale from A to B, it is not open to a purchaser of the articles from B, to impeach the consideration as usurious between B and A in B's purchase of A. Leader v. Ahearne, 4 Dru. & War. 499.

Again, no other person like Simpson can obtain any right, by assignment of the goods, to sue Wiggin & Co. in his own name for any wrong done in that sale. Consequently Simpson, in this bill, if recovering at all against Wiggin & Co., must recover on some agreement made by them with him, or some deception practiced by them upon him personally. All the transactions and statements made at Boston with Otis, are, therefore, irrelevant and incompetent in this bill brought against Wiggin & Co. by Simpson for a wrong done at Detroit, except as they may be shown connected together, or as the former may throw some light and explanation on the latter.

What then took place at Detroit is to be next considered. The sale there to Simpson was both in form and substance by Otis, and not by Wiggin. The former was the real owner of the goods then, though they had been virtually pledged or mortgaged to Wiggin & Co. as security for the purchase money. The money was paid and the notes and drafts given for the goods were eo nomine to Otis, and not Wiggin & Co. The benefits of the sale then were to be reaped by Otis, as principal, and not by Wiggin & Co., though the latter, as having a lien on the goods, would not relinquish it till they received from Simpson the money and notes, as in part a substitute or equivalent. The large discount on the goods at Detroit was also made by Otis, and not by Wiggin & Co. The sale at Detroit, then, must be considered a sale by Otis. But at the same time, Wiggin may well be regarded as coöperating with Otis, on account of the pledge of the goods to him and his partner, and his interest in having a good and seasonable sale made of the merchandise, for his security and payment. Furthermore, for what he might, as agent for Otis, and aiding him, say which was false or fraudulent, he might in person be answerable in a suitable action or bill. But the proceeding must not be against him and his partner, as this is, nor against him as principal, or to rescind the contract at Detroit, as if it had been made with him, and return the securities as if executed to him & Co., and not to Otis, because that contract was in form and in law between Simpson and Otis alone, and the securities were given to Otis alone, and afterwards were negotiated to Wiggin by Otis towards payment of the original purchase by Otis from him and his partner. It does not alter the state of things at Detroit on the allegations in this bill, that Wiggin there gave some guarantee as to the goods in the name of the firm, because if he had power to bind the firm by such a guarantee, which is doubtful in some views, this bill is not instituted for a breach of that guarantee, but rather for usury, oppression and fraud.

For reasons like these, it seems to me there are insuperable difficulties in sustaining the present bill against Wiggin & Co., even if Wiggin conducted towards Otis at Boston in the original sale in the culpable manner al-

leged, as Simpson had no concern in that conduct or contract. So, if Wiggin conducted, as is alleged at Detroit, he did it, not as a contractor or vendor, but the agent of Otis, selling to Simpson; his liability is not on the contract, and as a party to that, but for his falsehoods and misrepresentations, as a third person interfering.

Under this view, too, it would be very difficult to hold Copeland, his partner, liable for such acts by Wiggin, as is attempted here, acts to aid Otis, rather than the firm, and hardly imputable to Copeland, or such as he ought to be responsible for. But as amendments in the bill, or a new one might be resorted to, if this view would clearly dispose of the case as it now stands, and as some question may remain, whether in one aspect Wiggin & Co., as the present possessors of the notes and drafts by Simpson, might not be liable under the bill in its present form to some extent. in connection with the notes, if he was guilty of fraud at Detroit in aiding Otis's sale, so as to vitiate the notes and sale, it seems proper to examine further into the case. Certainly, the transaction with Otis at Boston would look, at the first blush, like usury. On an analysis of it, however, Wiggin does not appear to have been a money lender, and desirous of securing an exorbitant interest by means of a sale of property at exaggerated or sham prices, as is frequently done by usurers. On the contrary, he was a merchant and anxious to sell his goods at a high profit. And the loan seems to have been made or promised, to enable Wiggin to sell his goods, rather than his goods having been sold to enable him to lend his money. He appears to have been looking for high prices, rather than usury. This might change entirely the aspect of the case in regard to usury, but still leave it open to the other objections,—of oppression and fraud. Certain it is, also, that, independent of usury, the bargain, as a contract which Wiggin made with Otis, was in some aspects a hard one, and the contract which he helped afterwards Otis make with Simpson, though much less rigorous surely was not free from representations, as testified to by some witnesses, (though not altogether sustained by the other evidence,) and according to them going much beyond the usual commendations bestowed and expected from those who are vendors. The law cannot in such cases tolerate the low standard of morals and veracity adopted in some places, or in some branches of business, though it may not punish as deception what both parties expect as mere praise or puffing, and what may not, therefore, operate as falsehood or fraud. but merely as a flattering view of the qualities and value of the property on sale.

As society and trade exist, the law does not regard statements as to the general value and prices of articles sold with so much jealousy and strictness, as those in respect to title and particular qualities or particular facts connected with the articles. Prices are uncertain and fluctuating from various causes, and a vendor should be expected to put the most favorable coloring on the general excellence and high value of what he sells. An intelligent vendee, justly anticipating this, is not deceived by it. But when the vendor goes further and states particular facts as to title or quality, and especially those more within his own knowledge, reliance should and will be often placed on such statements and he be held strictly answerable for their correctness. Mason v. Crosby [Case No. 9, 234]. In this instance, however, the testimony of Otis and Howard, which goes to support the misrepresentations, comes from persons so interested in the question, if not in the result of this case, as not likely to be free from some coloring, and the circumstances under which Otis made both contracts were so urgent and imperative, and such a boon or relief was derived from raising the money in connection with them, that no great effort was necessary to make him incur large sacrifices knowingly, and without the influence or deception practiced on him. There was a strong inducement for him to close the bargain, even if knowingly supposing his loss might equal several thousand dollars, because he would thus raise funds which he had found himself otherwise unable to raise, and which were necessary to prevent a forfeiture and loss in the West of $15,000 or $20,000. Beside this, the balance of the evidence appears to be, that he acted with his eyes open, rather than under willful concealment or deception practiced upon him by Wiggin at Boston.

The tobacco, which was much the largest and most questionable item, would seem to have been taken after a full opportunity afforded to inspect its quality. If he omitted that opportunity, and chose to run the risk without much critical examination, it was his own fault or neglect. Beside this, it appears that he knowingly was to give a price beyond the wholesale one for cash, or even for credit, unless it was a credit at very remote points and on security not entirely certain. And, indeed, according to some of the evidence. it was understood to be a price calculated to indemnify Wiggin & Co. for all risks in so large a sale, and for other advances of $9,000, if needed. Nothing is shown of fraud as to the prices or qualities of the other articles, and the actual sales of these other articles in the end, though at auction and some of them damaged, fortifies this view; especially when we consider that those sales were at an unfavorable season. Several of them were nearly as high as the price given by Otis, and most of them above that given by Simpson, if the discount to him is spread in an equal ratio over the whole.

But when we come to the second sale by Otis to Simpson at Detroit, it is true that Simpson had not the same means of judging of the quality of the tobacco, by inspection,

as Otis had enjoyed, the tobacco not being present there. Beside this, the price in the invoice or bill of sale had been put five cents per lb. too high by direction of Otis; and Wiggin, though not originating this exaggeration, is sworn to have represented the value of the tobacco to be equal to what was named. And Simpson, unlike Otis in the first sale, would be obliged to rely on the invoice price and what was stated by Otis and Wiggin concerning its quality, in forming an opinion as to its true value. The tobacco, also, was the great item, constituting from one-third to one-half of the whole invoice.

It is to be recollected, likewise, that Simpson had no such reason for knowingly giving a high price as Otis, not being under a necessitous pressure like him, nor asking a favor like him, through the goods to raise money, and that Wiggin should have appreciated and respected this difference in making his statements there. But some extenuation and obviating circumstances exist in respect to this view of the transaction at Detroit. The large reduction which was made there to Simpson from the prices that had just been given by Otis, which was $800, beside the over entry of $1,000 on the tobacco, and the really higher value of these goods at Detroit than at Boston, might be considered, in the absence of other evidence, quite a sufficient inducement for him to trade without presupposing any fraud or falsehood practiced on him on the part of Wiggin at Detroit. After this deduction, it is far from certain that Simpson actually gave much more for the goods than they would have been worth at Detroit, if arriving there in season and undamaged, and the tobacco in as good a state as all parties were justified in expecting. One of the plaintiff's witnesses testifies to this, independent of the tobacco, which he did not see. It does not appear that Wiggin himself supposed the tobacco to be essentially injured by mould or age, but it had been sold to him low to close up an old consignment, and after the form of the plugs had become unfashionable, and was in reality worth more than he gave, and had originally been limited by the consignor at much more, viz., 28 cts., and would probably sell high in the West, where in this matter, at least, fashion would be less regarded than substance. This misapprehension, apparently on all hands, as to the condition of the tobacco, has not had sufficient weight in the argument, nor a series of accidents and untoward events, for which neither party can be very blamable. Several of them seem to have combined together to render the proceeds of this sale at Detroit most unfortunate, and very different from the anticipations which might honestly and naturally have been formed in respect to them beforehand.

The goods arrived too late in the season at Buffalo, being not till November, and many of them never reached Detroit at all,

and none till the next season. Parts were injured on the canal on their way to Buffalo, and others still were damaged while going thence to Detroit. Forced sales were also made of some at public auction, and at points short of Detroit, and where, if the market was glutted, they would not, of course, bring so much as farther west, nor so much after the forwarding season was over, and much less would they, when disposed of there on short notice, and for cash, and not as at retail, and partly on credit. The tobacco was never attempted to be sent forward to its destination, and sold there in the customary advantageous manner, but turned aside and hastened to New York City for disposal at auction prices, and at a loss similar to what might be sustained in sending coals to Newcastle. When the kegs were opened, likewise, and carefully examined, the effects of age and mould on the tobacco were found to be greater, probably, than the original owners before Wiggin, or Wiggin himself, or Otis had supposed. This difference would not seem to have been known to the respondents, or to have been concealed by any fraud, and its consequences must, therefore, fall on the possessor, as well as some of the evils from the other injurious acts which originated with the plaintiff's agents. These constitute the different aspects of the affair as connected with the sale at Detroit. They are not decisive as to the liability of Wiggin alone for what he did there, or if liable, not decisive as to any very large amount of damages caused alone by improper representations made by Wiggin. But the balance of the whole seems to give an unfavorable impression, to some extent, as to the correctness of his statements to Simpson, and his design by them to mislead him in the purchase.

There is, however, one other difficulty in a remedy for that in chancery, on the facts of the case as now presented, which is not to be overlooked. Instead of offering to return these articles at Detroit, where they had been sold and possessed the highest value, and then asking to have the contract rescinded, and the notes restored, which is the ordinary course in such cases, no offer was made to return any of them, except the tobacco, and that was at New York, and not Detroit.

Without holding that the neglect to offer a restoration of the property, or a restoration at a particular place, or that an inability to do it prevents this court from entertaining jurisdiction on its equity side, when the rescinding of a contract is asked, or other relief suitable to the case, it may, at least, be considered that such is the general rule, and any exceptions to it must be clearly made out before they can be sustained. 5 East, 451; Long, Sales, 242. Sometimes, when damages are a proper mode of relief, the party is sent to a court of law to recover them, when the remedy there is ample and

what has been received cannot be restored, so as to justify the equitable remedy of rescinding. At other times, if this court can, in a particular case, make an award of damages, as it sometimes does, it must be where part of the property can be restored, and damages allowed for the rest, or where a restoration is impossible through the wrong of the opposite side, or where jurisdiction exists, for other grounds and reasons, to proceed and give damages alone. Warner v. Daniels [Case No. 17,181]; 2 Story, Eq. Jur. § 794; 3 Merivale, 643. Whether damages alone could be given in equity, on the facts appearing here, or damages and a restoration of the drafts and notes, is very doubtful, if the bill was by Otis against both of these respondents. But it is quite certain that Simpson has no claim to such a decree, in a bill in the present form, and against both of them. His best chance for a recovery would seem, on the present evidence, to be in a bill against Wiggin alone, for his coöperation with Otis in representations in the sale at Detroit, as to the tobacco, which the plaintiff considers clearly exaggerated and untrue. But whether a recovery at all could then be had, or how much damages Simpson thus sustained, or what would be the true rule of damages then, and what the new evidence and principles to govern a recovery in such cases, different from those proper in a bill in form like this, and against Copeland, as well as Wiggin, cannot be properly decided now. But in order to leave the door entirely open for any other relief the complainant may be advised to attempt, I propose to let this bill be dismissed without prejudice.

An injunction now existing against the negotiation of the notes by Wiggin, it was allowed, on motion, that the decree of dismissal be not entered till the next term, in order, in the meantime, that new proceedings be instituted or the controversy arranged.